UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON    FILED _____ ENTERED
AT SEATTLE                        _____ LODGED _____ RECEIVED

SA  DEC 1 8 2002

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA  ) | |
| )  | |
| Plaintiff,  ) | |
| )  | |
| vs.  ) | Case CR02-283R |
| )  | December 11, 2002 |
| EARNEST JAMES UJAAMA,  ) | 2:35 p.m. |
| )  | |
| Defendant.  ) | |

# ORIGINAL

TRANSCRIPT OF PROCEEDINGS IN CHAMBERS
BEFORE THE HONORABLE BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the United States:    GEORGE Z. TOSCAS
                                   TODD GREENBERG
                                   ANDREW HAMILTON
                                   Attorneys at Law

On Behalf of the Defendant:        ROBERT S. MAHLER
(Defendant Not Present)            PETER OFFENBECHER
                                   Attorneys at Law

On Behalf of Bureau of Prisons:    DOUGLAS S. GOLDRING
                                   Attorney at Law


Caroline R. Castle
Official Court Reporter
(206) 553-1899


Proceedings recorded by mechanical stenography; transcript
produced by computer.

CR 02-283 #53

1    Seattle, Washington; Monday, December 9, 2002; 2:35 p.m.

2         THE COURT:  Okay, guys.  It looks like you really have

3    done some wonderful--did you work all night or what?

4         MR. TOSCAS:  Three straight days.

5         THE COURT:  You really accomplished a tremendous

6    amount.  I mean, things that I thought you were coming back to

7    me on, I think you've done an admirable job.  I hope--quite

8    frankly, you may have set some nice new ground rules for other

9    cases, so people don't have to quite fight for days.  There's

10   some good stuff.

11      Let's go--there are three left.  Right?

12        MR. MAHLER:  Actually, Your Honor, Mr. Toscas pointed

13   out an oversight we all made despite the 9,264 times we've

14   reviewed various drafts.  George, there is one provision that we

15   all agree to.  And, George, you can just read that.

16        MR. TOSCAS:  Your Honor, I believe that this would fall

17   in Section 2 under legal visits and would probably be

18   Subsection D, as in David.  And the language that we would

19   propose would be--and I can write this out and provide it to the

20   Court; all I have is a handwritten copy--Mr. Ujaama's counsel,

21   pre-cleared co-counsel, investigators and paralegals shall not

22   disseminate the contents of Mr. Ujaama's communications to third

23   parties except as necessary for the purpose of preparing the

24   defense.

25      It's a similar provision that is in the telephone and the

1  mail portions of the protective order.  But we overlooked
2  somehow--

3      THE COURT:  Well, you're going to have to do this over
4  anyhow.  Fine.

5      Okay.  So let's go to the first one--am I right?  There are
6  just three?

7      MR. MAHLER:  That's right.

8      THE COURT:  The first one--how do you want to do this?
9  Do you want to give me just brief arguments, or do you want me
10 to just--

11     MR. MAHLER:  Yeah.  I think if we could just restate
12 our positions.  This is a dispute that we aired out in court the
13 other day.  I don't think the parties' positions have changed.
14     Our objection to the government's language is that this is
15 the exact language that the warden used initially to exercise
16 discretion to prohibit contact visits.

17     We'd like something that's more specific, more particular,
18 that sets out that it's the Court's order that contact visits
19 shall happen unless the warden is aware of some specific
20 information that he needs--or that he has that should cause him
21 to prohibit contact.

22     So that's our position.

23     MR. TOSCAS:  Your Honor, as we stated the other day in
24 open court, the proposed language that we advance is the policy
25 at the Bureau of Prisons that applies to all inmates.  And what

1  we're seeking to avoid is having a policy that applies to

2  700-plus inmates in an institution and another policy that

3  applies--or another standard, I should say--that applies to

4  Mr. Ujaama.  I think that we may all be able to agree that

5  circumstances that would satisfy defense proposed language would

6  also satisfy the government's proposed language.  And--

7          THE COURT:  But the other way around isn't true.

8          MR. TOSCAS:  I think it is true.

9          THE COURT:  Well, I would say--I would agree with you

10 and perhaps defense might even have agreed with you, if it

11 weren't for the fact that it was in the exercise of "sound

12 correctional judgment" that they denied contact visits in the

13 first place.  And upon closer scrutiny, i.e. when they came

14 before the Court and you all had to actually give a reason for

15 it, there wasn't any reason for it.

16         MR. HAMILTON:  Your Honor, if I could address the

17 Court.  When there was a problem, defense counsel contacted us.

18 We went to work with the SeaTac facility with the warden.  We

19 even went to the Department of Justice.  I believe the Bureau of

20 Prisons talked to the warden.

21    And that problem went away.

22         THE COURT:  You know, it still hasn't gone away in

23 general.  In this facility, in this district, and--

24         MR. HAMILTON:  I understand what the court's saying.

25 But it has gone away with respect to this.

```
 1            THE COURT:  Yes.  But you know my concern.  The concern
 2   I have is that defense counsel shouldn't have to be going to the
 3   government, hat in hand, to say:  We need to talk to our client.
 4       Now, it's true that--you know, I know you, Mr. Hamilton and
 5   I'm getting to know Mr. Toscas.  And I know that if they go to
 6   you and say this personally, if the Court goes to you and says
 7   it, it will be worked out.  But they shouldn't have to do that.
 8       And I have to go with--let's say the Court can take judicial
 9   notice of other problems that we're having at this very same
10   institution.  And I am not terribly impressed with the sound
11   correctional judgment that is being used there not only in this
12   case on one time, but in other cases.  You know and I know there
13   have been--you may not know this, Mr. Toscas, but there have
14   been problems.  And I don't think that the "sound correctional
15   judgment" is always what I would want to use as a yardstick.
16       Now, I guess I'm not happy with specific information,
17   either.  Okay?  So I was kind of hoping you guys would find a
18   middle ground.  And maybe--
19            MR. HAMILTON:  We could come back to this, if the Court
20   wants to.  This is something that we've danced around for three
21   days.
22            THE COURT:  I understand.  And I'm not being very
23   helpful, because I've had it for three minutes.
24            MR. HAMILTON:  And the problem is--I mean, I understand
25   where counsel's coming from.  And the Court alluded to this at
```

1    one of our hearings.  This document is a precedent-setting

2    document.  And while the four of us representing the government

3    sitting here can live with this, we're not sure of the

4    ramifications in Washington, D.C.  And that's--

5         THE COURT:  Okay.  Let me address that for a minute.

6    Because this is something that defendant's raised in his brief

7    that we haven't really touched on, and I think maybe at some

8    point we have to and maybe so we can get down to these last few

9    things that you can't agree.

10        And that is how broad a brush you can paint with when you do

11   this and who is the defendant we're dealing with in each case.

12   Quite frankly, I have not had any showing to me in other than

13   the broadest language, and I haven't asked for it because

14   frankly I haven't--we're in such threshold questions, I haven't

15   really thought it was necessary.

16        But I haven't had anything shown to me that we're dealing

17   with a defendant here who's going to stick a pencil in

18   somebody's eye or shave a spoon or something.  I haven't had any

19   of this.  I don't have before me a defendant who has the notches

20   in his belt that would make me worry about the kinds of things

21   you're all worrying about.

22        He falls in a category that immediately makes one's antennas

23   go up.  There's no doubt about it.  And any court would be

24   foolish not to take into account that we are dealing with a

25   category of cases that deserves special treatment.  If it

1  didn't, we wouldn't be sitting here day after day parsing these
2  words out.  And I think defense counsel have recognized this,
3  too.  It would be foolish of them not to.

4      So when you say "precedent-setting," yes.  It is
5  precedent-setting.  But I would trust it's not going to bind
6  anybody.  If we're a little more lenient with some of these
7  clauses with Mr. Ujaama, that doesn't mean if you get a guy in
8  here, you know, who you can show to a court has done something
9  really, truly awful that they're going to be bound by anything
10  we're doing here.  They'll go a hundred percent in the other
11  direction.

12      And if you want to make a showing to me at some point that
13  you--and I don't know what information you have.  They don't,
14  either.  But I'm the last one to know around this table.

15      But if you have something to show me that Mr. Ujaama has
16  done something violent, truly violent along the lines we're all
17  concerned about, I'd be more inclined to step further over.  But
18  I haven't seen it yet.  Maybe I'll see it when the proof comes
19  in.

20      But if the guy's just--so far, all I know is that he's been
21  trying to buy some land.  Now, that's not--he may have tried for
22  the wrong people.  But it's not the same as analogizing to
23  somebody who tried to kill a judge and a jail guard.  You see
24  what I mean?  There's a bit of a leap here.

25          MR. HAMILTON:  Sure.  I just wanted to clarify a couple

1  things.  First of all, in terms of Mr. Ujaama the phrase that I
2  use is he's--we don't have any evidence that he is a
3  bomb-thrower.  We do think he has a temper, we think he's been
4  in fights, we think that he's swung on people.

5          THE COURT:  Well, he's at least beat up his wife a
6  couple times because they found that in court.

7          MR. HAMILTON:  Had to take an anger management course
8  in Tukwila.

9          THE COURT:  I thought it was somewhere else.

10         MR. HAMILTON:  Tukwila.  Yeah.  When I talk about
11  precedent-setting, I mean in any terrorism case in the United
12  States defense counsel, whether it's Boston, Chicago,
13  San Francisco, wherever a terrorist suspect is arrested, this is
14  the first thing that court is going to look at.  This is
15  precedent-setting nationwide.

16     Before--I mean, the first document we looked at was what the
17  judge did in Boston with Richard Reid, because that pushed the
18  envelope as it existed at that point in time.  We've pushed the
19  envelope with this.  This is precedent-setting nationwide.
20  People at DOJ--you're laughing at me.

21         THE COURT:  I'm laughing because the envelope got
22  pushed by the act.  We are--I would describe it as pulling back
23  from a pushed envelope.  But it all depends on where you were
24  sitting.

25         MR. HAMILTON:  I suppose that's true.  So the concern,

1  if I could just--the concern, the rub with this is that from a

2  policy point of view, from the eyes of Department of Justice,

3  they wouldn't know Tukwila if it ran over them in a car.  They

4  have no connection to this district.

5      But they look at this, and the thing that we're trying to

6  avoid is the creation of a double standard.  Where I think, as

7  Mr. Toscas said, let's say there's 800 people at SeaTac and

8  799 operate under one system.  James Ujaama operates under a

9  separate system.

10             MR. OFFENBECHER:  But that's exactly what the SAM is.

11             THE COURT:  But this isn't the SAM anymore.  We're now

12  in a protective order.

13             MR. MAHLER:  Let me suggest--

14             MR. HAMILTON:  Just one point.

15      All we're saying is as a matter of course, the prison has to

16  have some flexibility and some discretion.  And what I'm saying

17  is the fear that counsel has is not going to be realized in this

18  case.  Because if anything happens, they have my cellphone.

19  They will call me.

20      Now, I know they shouldn't have to.  And I'm saying they

21  won't have to.  I'm saying this will never come about.  But in

22  the event for any reason it does, we'll cover it.

23             THE COURT:  Okay.  Why don't we add--

24             MR. HAMILTON:  I didn't mean to cut you off.

25             THE COURT:  Why don't we just add a sentence.  I do

1   think--I've already expressed on the record how concerned I am

2   if contact visits were cut off.  I think Mr. Goldring has heard

3   me.  He's right here at SeaTac.  He knows exactly how I feel

4   about that.  Mr. Hamilton has heard me.  And he didn't even have

5   to hear me; he would correct it anyway.

6       Why don't we just--I don't want him to be under a different

7   set of regs than anybody else.  I don't want it either going

8   against him or going for him.

9       I think what might cure this is if we added a sentence to

10  the government's proposed language and just say:  In the event

11  that--I'm not going to give you the exact language.  What I want

12  to say is:  In the event that the institution terminates,

13  abridges--no, that's bad--suspends, thank you, suspends

14  Mr. Ujaama's right to contact visits, defense counsel shall

15  immediately contact the Court and a hearing will be afforded

16  promptly.  Or something like that.

17      The fact of the matter is, Mr. Hamilton, I would trust

18  they'd contact you before they'd contact the Court and get the

19  whole thing resolved.  But I will give a prompt hearing, an

20  immediate hearing.  Okay?  And I don't think it's really going

21  to come up, because I think you three--okay?  Can you all live

22  with that?

23      Problem, Mr. Toscas?

24          MR. TOSCAS:  I think we could work out that language,

25  obviously.  We've worked out far more difficult language.  But I

1   don't know--and I'd have to consult with Mr. Goldring.  I don't
2   know if technically we call it a "right" to contact visits.
3           MR. GOLDRING:  I wouldn't call it a "right."
4           MR. TOSCAS:  But:  Shall not suspend legal contact
5   visits unless--
6           THE COURT:  You don't need the word "right" in there.
7   I was just shooting from the hip here.  Okay?
8       Okay.  What is the reg--can you live with that?
9           MR. MAHLER:  Yeah.  I guess I will say what I was going
10  to say.
11      You know, my sense was if the government's concern is about
12  a standard different for Mr. Ujaama than for others, the
13  language that I'd like to see is an additional sentence to the
14  defendant's proposed version that says:  Because of the warden's
15  initial denial of contact visits in this matter, the Court
16  believes that some other circumstance need be shown before
17  contact visits are suspended, or something that takes this out
18  of the mainstream.
19      So that when the lawyers in San Francisco, Boston,
20  Philadelphia have their case, they can look at that language and
21  say:  Well, there was a preexisting problem here.  So Ujaama's
22  case is different.  I still--I mean, I guess I still--
23          THE COURT:  Well, that would cut--you see, if there
24  were no problem, we wouldn't be fighting about this.  And I
25  assume that in another district they won't be, because they

1      won't have a history. So who cares?

2      I am concerned--I know you're concerned. We all have a

3   reason for being concerned here. But I think let's assume for

4   now that the message has gotten through. Okay? That, you know,

5   I don't think SeaTac had seen a case like this before. Few

6   courts had. And sometimes people overreact the first time

7   around. And everybody overreacts these days about this sort of

8   thing.

9      And they've gotten the message. Mr. Hamilton made a phone

10   call; it all got cured. Let's not look under the bed for

11   bogeymen. Okay? We'll have enough problems to deal with. If

12   it comes back, you can always move to have me change that

13   protective order: We need stronger language.

14      But I'm trusting that--Mr. Goldring is sitting here. He

15   knows what we're all talking about. I don't think you're going

16   to have any problem.

17          MR. MAHLER: All right. Thank you.

18          THE COURT: Unless there's specific information on

19   which to base a reasonable belief.

20          MR. GOLDRING: In reality, Your Honor, if there was

21   ever an instance that non-contact visits would become necessary,

22   we'd certainly have specific information we'd be able to present

23   to the Court at that time. I don't anticipate that ever coming

24   up.

25          THE COURT: I would trust that they would. Because

1  they know you're going to come to the Court. If they know

2  you're coming to the Court, they better have a good reason for

3  doing it.

4        MR. HAMILTON: Can I just tell the Court when I first

5  got the call from defense counsel about non-contact, I called

6  the warden. I actually was able to speak with the warden.

7     And I just want to let the Court know, what he said to me

8  was: Look, we have a guy that has just come into our prison.

9  We don't know anything about him. He's charged with being a

10  terrorist.

11     He said: This will probably change. And also, there was

12  some type of--I think Mr. Ujaama was involved in an altercation

13  while he was in Virginia. It may not have been his fault, but

14  it was written up as an altercation over a newspaper.

15        MR. OFFENBECHER: The other guy got written up. He

16  didn't get written up.

17        MR. HAMILTON: All I'm saying is the information came

18  that there was an altercation.

19     He said: You know, in 30 days or so when I get to see the

20  lay of the land, it may change. But right now in my sound

21  discretion, I think it's necessary.

22     Now, we convinced him otherwise. But that's what he was

23  operating on. I just wanted the Court to know that.

24        THE COURT: Okay. We all know that--I'm just telling

25  you when you--how many times in this warden's lifetime do you

1   think he ever had a prisoner who was called a terrorist before?
2   I would hazard a guess, zero.

3          MR. HAMILTON:  There was Ressam.  Well, Ressam was
4   there before this warden came here.

5          MR. GOLDRING:  And I think he was already well on his
6   way to being found guilty by the time the warden got here.

7          THE COURT:  It's not worth it, guys.  Live with this
8   language.  If it doesn't work, if we have a problem with it, we
9   can come back.  And I'm not worrying about other districts right
10  now.

11         MR. TOSCAS:  One question that I had, and I hate to do
12  this, because I may be--I may need Mr. Goldring to answer it.
13  But one of the concerns that we had in maintaining the standard,
14  as it applies to all people, is that on a given day for whatever
15  reason, whether they're short on staff or they're having an
16  exercise or a drill, on that one particular day they may have to
17  say:  Sorry, defense counsel.  Today it's not non-contact for
18  everybody.  Or:  Today it needs to be non-contact, because we're
19  having an exercise or a drill or we're short on people today.

20     That's something that we tried to make--leave open, so that
21  they could do it.  But is that the type of--

22         THE COURT:  They're not going to run to the Court with
23  that.

24         MR. GOLDRING:  And if they come to me with that on a
25  day like that, I'll explain it to them.

1       MR. MAHLER:  It's not an issue.  I think we can move
2   on.

3       MR. TOSCAS:  All right.  We can move on.

4       THE COURT:  Okay.  Actually, I think that's probably
5   the least of our problems.

6    Okay.  Let me ask Mr. Goldring, what is the usual situation
7   with legal telephone calls?

8       MR. GOLDRING:  The usual situation with legal telephone
9   calls, and I guess I'll just start with saying a usual situation
10  for an inmate in the Special Housing Unit where he's housed,
11  they would make a request of their unit team and say:  I need a
12  legal telephone call on such-and-such a date or time that my
13  attorney told me to call them.  Or they'll say:  I need a legal
14  telephone call.  Usually they'll put it in writing.

15   Typically their counselor, but sometimes another member of
16  their unit team, they'll make every effort to come up within
17  24 hours of having received the note and give them a legal phone
18  call.

19   A few accommodations we made with respect to Ujaama
20  specifically, because he was complaining it was taking too long
21  for him to get calls, was we said:  Okay, rather than him giving
22  his notes to any staff member in the Special Housing Unit, only
23  give it to a member of the unit team.  And there is a member of
24  the unit team making rounds through the Special Housing Unit on
25  a daily basis, at a minimum.

1    And I said:  And then if his counselor is not available, any
2    member of the unit team can give him legal phone calls.  We
3    tried that for a little while--

4         THE COURT:  I wasn't talking about that.  I was talking
5    about monitoring, recording or intercepting.

6         MR. GOLDRING:  We never monitor, record or intercept
7    legal phone calls.

8         THE COURT:  To and from?  Both ways?

9         MR. GOLDRING:  Yes.  We have two separate telephone
10   systems.  One is the inmate telephone system where they make
11   their social calls.  And they can call their attorney from
12   there, and it would be monitored if they chose to call their
13   attorney from that system.  There's a big sign.  They're all on
14   notice this is a monitored telephone call.

15       If they choose to use the unmonitored system with someone in
16   the Special Housing Unit, for example, they're brought to an
17   area that has an outside line.  In this case it's in the
18   non-contact visitation room, because that's the only place that
19   has an outside line in the Special Housing Unit that's not part
20   of the inmate telephone system that they can use.

21        THE COURT:  How do you make sure they're, in fact,
22   calling their attorneys?

23        MR. GOLDRING:  What happens is the counselor dials the
24   phone.  And when it connects, they say:  Could I please speak
25   with Bob Mahler?  Bob Mahler gets on the phone, they verify that

1    and hand the handset of the telephone over to the inmate.

2              THE COURT:  Okay.  And when Bob Mahler calls

3    Ujaama--well, say Bob Mahler calls Joe Smith.

4              MR. GOLDRING:  Inmates can't receive incoming phone

5    calls.  They can only make outgoing phone calls.

6              THE COURT:  So when you want to talk to Ujaama--

7              MR. MAHLER:  I get in my car and drive there.  Which

8    takes half a day, if I want to spend 10 minutes with him.

9              THE COURT:  Well, you better save up all your

10   questions.

11             MR. HAMILTON:  And we have the same problem.  It kills

12   our half day, also.

13             MR. OFFENBECHER:  When you want to talk to Ujaama?

14             MR. HAMILTON:  When we want to talk to Ujaama.

15             MR. MAHLER:  I think we may need an amendment to this.

16             THE COURT:  Well, that will take a little longer.

17   Okay.  So why does the government object to this additional

18   proposed language, if nobody else is having it done?  Remember,

19   we want to keep him just like everybody else.

20             MR. TOSCAS:  Yes.  First, Your Honor, the way the

21   protective order was fashioned was that it would be an order

22   that addresses the conduct of defense counsel first.  And this

23   would be straying away from that notion.

24        Number two, it is clear that not only is it Bureau of

25   Prisons policy that they don't record attorney-client

1    conversations, but the SAM specifically states in no uncertain
2    terms that attorney-client monitoring is not allowed.  That
3    would call for--would only be called for in an extraordinary
4    circumstance, and there's only--you know, there's a part of the
5    SAM that calls for or allows for the Attorney General to order
6    such monitoring, and the SAM specifically says that it does not
7    so authorize.

8        As a result, we believe that not only does the Bureau of
9    Prisons policy cover it adequately, but the SAM makes perfectly
10   clear that these calls are not to be recorded, monitored.  It
11   does not authorize attorney-client monitoring.  And as such,
12   there's no reason to add it into this order, which deals with
13   defense counsel.

14            THE COURT:  And why do you think you need it?

15            MR. MAHLER:  Well, the first point, Your Honor, is the
16   SAM--the protective order deals with more than just governing
17   our conduct.  It also deals with attorney-client communications.
18   And the whole idea of the motion was to preserve our client's
19   Sixth Amendment rights, as well.

20        I think that we've had problems as we described, and we've
21   heard the government's rebuttal on that.  But our--we heard our
22   client's legal communications with us being overheard.  You
23   could--

24            THE COURT:  Well, that's debatable, given the
25   description.

1         MR. MAHLER:  I understand.  But we feel that having the

2  Court enter an order that this court specifically believes that

3  overhearing these phone calls or monitoring them or recording

4  them, intercepting them in any way should be prohibited--we

5  should have the right to a privileged conversation with our

6  client by phone.  It's important for us.

7         THE COURT:  It is important.  But so far as I can tell,

8  it's provided for in the SAM which is directed to the

9  institution.  Right?

10        MR. TOSCAS:  Yes.

11        THE COURT:  I'm not going to--I don't know what

12  happened.  The description of what took place--this is with the

13  glass and the room and whether you could hear and they could say

14  "No" or whatever?  Who else was there?  I forget.  Somebody was

15  there who described it to me.

16        MR. TOSCAS:  I and Mr. Goldring described it.  Because

17  I had asked Mr. Goldring about it, and he spoke to the

18  correctional facilities employee who was actually there

19  providing--walking him to and from his legal conference.

20        THE COURT:  Okay.  Let me tell you what.  For now, I'm

21  going to leave it out.  If you go back there, you're not going

22  back--you'll be going back there on, obviously, a lot of

23  occasions--why don't you, one from each side, go in and one of

24  you sit on one side and talk in a regular voice from a place

25  where you'd be sitting on the telephone and one of you stand on

1 | the other side and see if you can hear.

2 | MR. GOLDRING:  Your Honor, I've done that.  I went up

3 | there with one of our lieutenants after I saw their complaint,

4 | and I did that and had her sit on one side of the glass and I

5 | sat on the other side where the counselors typically sit.  You

6 | could hear noise coming from the other side, but you couldn't

7 | discern specific language unless you sat right up against the

8 | glass.

9 | The other thing I've done is--and I haven't done this yet,

10 | but I am going to do.  You can visually monitor--we're required

11 | to visually monitor the telephone call.  You can do that from

12 | the other side of the glass.  You can also do that from the

13 | hallway.  And I'm going to tell the correctional counselor from

14 | now on--

15 | THE COURT:  Is there a TV in the hallway?

16 | MR. OFFENBECHER:  You can just look through the glass.

17 | MR. GOLDRING:  There's a glass in the doorway.  I'm

18 | going to make sure she's in the hallway looking through the door

19 | to avoid any appearance of this problem occurring again.

20 | THE COURT:  Okay.  That will work.  Okay.  I think you

21 | have the language in the SAM, and that should do it with this

22 | assurance.  If you have any problems, you know where I am.

23 | Okay.  The last one I thought--the last one I thought we

24 | dealt with at the hearing.  I can't remember what we came up

25 | with.  Do you recall?  I remember the government thinking that

1  there was some need to at least make sure that things weren't
2  tucked away in the legal effects that weren't legal effects.
3  And I think everybody agreed that they're not supposed to be
4  reading his legal papers.

5         MR. MAHLER:  That's the key issue here, Your Honor.
6  Nobody disputes that they can thumb through, leaf through his
7  legal effects to make sure there's nothing that would be
8  dangerous or contraband in there.  That's why we used the words
9  "read or seize" his legal effects.  What we want protection from
10  is the institution or some employee of the institution taking
11  his legal papers out and reading them.  I don't see how that
12  could possibly offend institutional security.

13         THE COURT:  That's a tough one.

14         MR. TOSCAS:  Well, first, Your Honor, again, I don't
15  think that it's a minor point to say that this--such a provision
16  deviates from the thrust of a protective order that, on its
17  face, says this deals with conduct of defense counsel.  I
18  understand Counsel's response to that.  But I believe that the
19  remainder of the order is very well crafted to deal with defense
20  counsel's concern.

21      However, in this instance it's clear that--or there is no
22  claim that there's been a violation of this or that there is a
23  problem thus far with employees of the institution reading such
24  mail.  On a--

25         THE COURT:  Are we talking about mail now?

1          MR. TOSCAS:  I'm sorry.  Reading such material.

2    Misused the word.

3       On a practical level, just based on what I've learned in the

4    past few weeks of dealing with these issues and discussing how

5    these institutions operate, on a practical level the people that

6    are doing the cell searches really could not care less what the

7    document says, as long as by flipping through it they realize

8    it's not contraband or it's not an escape plan or something of

9    that sort.  They need to be able to flip through materials to

10   ensure that they are what they claim they are.

11      And I assume--or I believe, I think maybe the inmates, some

12   of the inmates use notebooks or folders, binder folders, that

13   say Legal Materials so that they're clearly set out or set

14   apart.

15          THE COURT:  Okay.  Now, we have around this table seven

16   people--count my law clerk--eight people, all of whom have

17   probably taken a large number of English lit courses, writing,

18   maybe even before we went to law school some creative writing

19   courses.  Find me words without using the thesaurus that will

20   say:  In conducting cell searches, BOP and USMS personnel, while

21   able to leaf through--

22          MR. TOSCAS:  May I propose some language?

23          THE COURT:  Are you getting help?

24          MR. TOSCAS:  From the brains of the organization.

25          THE COURT:  Mr. Greenberg--

1    MR. TOSCAS: In conducting cell searches, BOP and/or

2 USMS personnel shall not read for content or seize Mr. Ujaama's

3 legal effects. BOP and/or USMS may, however, review and inspect

4 such materials for the limited purpose of confirming that the

5 materials are legal effects.

6    THE COURT: How about that?

7    MR. OFFENBECHER: Well, the real problem with that is

8 that if you're not--what does "review and inspect" mean? I

9 mean, again--

10    THE COURT: They're going to do it, and they're going

11 to have the right to do it.

12    MR. OFFENBECHER: They do under there. All we're

13 saying is they can't read it.

14    THE COURT: No. This is not clear enough. Because

15 "read and seize" doesn't say that they can at least--well, it

16 does say the same thing. But what's wrong with--

17    MR. OFFENBECHER: "Review and inspect" means many

18 things to different people. This will be interpreted by one of

19 maybe 20 correctional officers who are now permitted to review

20 and inspect Mr. Ujaama's legal effects.

21    MR. GREENBERG: For a limited purpose: just to

22 identify as legal effects.

23    MR. GOLDRING: When we review any, for example, legal

24 mail, the way our policy is written is we review and inspect the

25 legal mail in the inmate's presence. And we open up the

1  envelope in front of the inmate, flip through it with the inmate

2  to make sure everything is what it says it is, and then give it

3  to him.

4      It would be basically the same process when we're going

5  through his legal effects in his cell.  We pick up whatever is

6  determined to be legal materials, flip through it, review and

7  inspect it to make sure it is what it says it is, and then put

8  it back.

9          MR. MAHLER:  Instead of "review and inspect," would you

10  be satisfied with something that said:  BOP personnel may

11  conduct a cursory examination?

12          THE COURT:  "Cursory" is good.  How about "cursory

13  examination," "cursory inspection"?

14          MR. GOLDRING:  That's fine.

15          MR. MAHLER.  So we say:  Personnel shall not read for

16  content or seize Mr. Ujaama's legal effects.

17      And then the second sentence?

18          MR. TOSCAS·  BOP and/or USMS may, however, conduct a

19  cursory examination of such materials for the limited purpose of

20  confirming that the materials are legal effects.

21          THE COURT:  Sounds good to me.  Okay?

22          MR. TOSCAS.  And obviously, if what he has marked

23  as--just strike that--strike that.

24          MR. OFFENBECHER:  Shall we put that in:  Anything

25  that's marked as attorney-client privileged?

1        THE COURT: No. No, no.

2        MR. TOSCAS: No.

3        THE COURT: They're going to look at it anyway.

4   They're not going to read it. They're going to give it a

5   cursory examination. Because they even do that with--you see,

6   we don't want to open Pandora's box on the mail.

7        MR. GOLDRING: Thank you.

8        THE COURT: But--I don't even want to ask if there's

9   anything else, because I know you'll come up with something

10  else.

11       MR. MAHLER: There's something else.

12       THE COURT: That's what I thought.

13       MR. TOSCAS: And I have something else, as well.

14       MR. MAHLER: Unrelated to the SAMs. The Court

15  received a letter from Mr. Ujaama's grandmother.

16       THE COURT: I sent it to everybody.

17       MR. MAHLER: And as long as we have the pleasure of

18  Mr. Goldring's company here today, I thought it would be a good

19  opportunity to maybe address the issue of getting my client's

20  grandmother and son in to see him.

21     We talked about it briefly before Your Honor came into the

22  library. It's our understanding that under the SAMs, these

23  people are not--

24       THE COURT: Why not? Well, wait a minute. Was this

25  the same thing you were going to talk to me about?

1          MR. TOSCAS:  No.

2          THE COURT:  Why can't his grandmother see him?

3          MR. GOLDRING:  The SAM defines immediate family members

4  who are allowed to visit him, and "grandmother" is not--unless

5  we--George?

6          THE COURT:  Going to change the SAM?  Here we go again.

7  Do I have to incorporate them into the protective order?  I

8  mean, come on.  Just change the SAM.

9          MR. TOSCAS:  The protective order doesn't need to

10  incorporate that.  Let me get back to D.C., and obviously--

11          MR. MAHLER:  And what?

12          MR. TOSCAS:  I've told you we will be looking at

13  ultimate revisions of the SAM, and we'll take care of that issue

14  one way or the other.

15          THE COURT:  No.  Take care of it one way.  There are

16  going to be people--there are going to be people who come before

17  you under a SAM.  Let's take a little hypothetical case.  The

18  guy doesn't have a mommy and a daddy.  Okay?  He's been raised

19  by his grandmother his whole life.  Or his aunt.  Or his foster

20  mother.

21          MR. TOSCAS:  We'll take care of it, Your Honor, I

22  assure you.

23          THE COURT:  If the SAM isn't going to be flexible

24  enough to include a person's immediate family by who their

25  immediate family is--what are you going to do with common-law

1    wives?  Half the people I see in sentencing are living with

2    women for 10, 15 years and they never marry.

3            MR. TOSCAS:  Enough said.  We'll take care of it.

4            MR. MAHLER:  Which brings me to the next point that I

5    didn't realize I had until a moment ago.  That is, when can we

6    expect to get the modified SAM?  Because there were a number of

7    modifications to the language of the SAM.

8            MR. OFFENBECHER:  And, in fact, the negotiations

9    surrounding the protective order depended on changes in the SAM.

10   So they're kind of interlocking.

11           THE COURT:  My message to you guys is I want to get

12   these things signed and in place.  You're spending valuable time

13   that you should be spending--don't we have a June trial date of

14   this year?

15           MR. MAHLER:  Sure do.

16           MR. HAMILTON:  Next year.

17           THE COURT:  Well, you know what I mean.  This June, not

18   a year from June.  This June.

19       Guys, that's only six months away.  You've got to get

20   started on something other than these things--okay.  I don't

21   want to imply that they're not important.  Because you're

22   absolutely right:  They are precedent-setting, and they are

23   groundbreaking.  And a lot of the things we're doing here will

24   probably save you a lot of time in other cases.

25       The fact that we now know "immediate family" has to be

1  subject to some kind of--once you talk in this case--I assume in

2  the next case you'll just make a list and see who his--since we

3  haven't had any "she's" yet--his immediate family is and you

4  adjust accordingly.

5      Okay.  When can we get the stuff signed?

6              MR. TOSCAS:  The protective order I think can be--

7              THE COURT:  Tomorrow?

8              MR. MAHLER:  Oh, yeah.

9              MR. TOSCAS:  We can have that language over to the

10  Court possibly even by the end of the day.  I don't know who has

11  the final draft.

12             THE COURT:  Tomorrow.

13             MR. TOSCAS:  But as for the SAM, which I think is--

14             THE COURT:  You want to take some time and read this.

15  Because, remember, you guys missed that D.  These things--every

16  line has to be in there.  So take your time and get it to me

17  tomorrow.

18      What about the SAM?

19             MR. TOSCAS:  The SAM, I don't know if--

20             THE COURT:  Monday?

21             MR. TOSCAS:  That's going to be difficult for me,

22  because I lose a day going back.  And--

23             THE COURT:  You guys are in the wrong time zone.

24  Tuesday?  Remember, faxes.

25             MR. TOSCAS:  I understand.  I'm just trying to think of

1   the different levels of review that's going to be required.   If
2   I could have--if I could have until next Friday with the
3   understanding that if at all possible I could get it done
4   sooner, I absolutely will.

5          THE COURT:  All right.  As long as you guys can just
6   put this aside and go on with the rest of the case.  As long as
7   you're comfortable, we're all comfortable with what the SAMs--I
8   don't want him--let his grandmother visit him before next
9   Friday.  She wants to see him.  This is Christmastime.  You
10  know, people have--if you can just take care of that part of it.

11          MR. MAHLER:  How about could we just ask the Court to
12  enter a minute order saying that the SAM is superseded to allow
13  the grandmother to visit before Christmas?

14          MR. TOSCAS:  Is all her paperwork filled out?

15          MR. GOLDRING:  I don't think so.

16          MR. TOSCAS:  That needs to be clear.  The paperwork
17  needs to be done, and BOP needs to have received it.  Whatever
18  the SAM says.  If that's done and she's available for a visit
19  within the next few days, we'll make that happen.

20          THE COURT:  Let me say this.  Mr. Goldring, will you go
21  back--if the paperwork isn't done, give Mr. Mahler or
22  Mr. Offenbecher a call immediately and say:  If she says she's
23  done it, we can't find it.  Or:  She hasn't done it.  And let
24  her do it over again.  Get her to fill out the forms they need.
25  And they'll arrange--

1   MR. GOLDRING:  First thing tomorrow morning, I will

2   verify which individuals have returned paperwork.  And if we

3   don't have paperwork from the grandmothers, I will contact

4   Mr. Mahler.

5   MR. MAHLER:  What about Karim, who is 12?

6   MR. GOLDRING:  I don't think he needs paperwork, but he

7   would have to be accompanied by an adult.

8   MR. GOLDRING:  Is it both grandmothers?

9   MR. MAHLER:  Both grandmothers would be good.  The

10  paternal grandmother was in town over Thanksgiving and wanted to

11  visit and wasn't able to because of the SAM.

12  THE COURT:  Okay.  We're going to work on it.  Okay?  I

13  think there was something in the letter that said she was coming

14  up--or the implication was she might be coming up again for

15  Christmas.  If she is, she should be able to visit.

16  MR. GOLDRING:  I'll look into it first thing in the

17  morning.

18  THE COURT:  But she'll have to do paperwork, too.

19  MR. HAMILTON:  When we had our telephone conference and

20  the Court entered a temporary order, one of the things the Court

21  said was the mother gets to visit Mr. Ujaama.  That happened.

22  We don't oppose a similar type order.

23  I just want to make sure the Court is aware of the

24  tremendous problems facing Mr. Toscas when he goes back to DOJ.

25  There's only a set number of people in the Department of Justice

1  who have the authority to modify a SAM.  It is a very elaborate

2  procedure.  He's going to be taking care of this, but it's not

3  something like a phone call.

4          THE COURT:  You don't want to tell me that,

5  Mr. Hamilton.  Because the stronger your argument is along those

6  lines, the weaker your argument is for SAMs at all.  Because one

7  of the reasons we're having a protective order for some of these

8  matters, rather than a SAM, is that I am reachable.  You don't

9  have to go through several levels.  You can get a hearing

10  probably within an hour or two, if you really need one.  And if

11  I'm not, there are six other judges around here.

12      But that's okay.  I'm not backing off the fact that we have

13  SAMs.  But what you have to demonstrate to me is that you can

14  work on a short turnaround, regardless of how few people there

15  are there and regardless of the fact that they all may take off

16  from December 23rd through January 7th or whatever they do back

17  there when they--you know, if you tell me that without going

18  through 60 different chains of command you can get somebody's

19  mother and twelve-year-old son in to see them, that's good

20  enough for me   And for them.

21          MR. TOSCAS:  And, Your Honor, I can say in the SAMs

22  that have been implemented in the past, I think Mr. Hamilton had

23  said to you in one of the first hearings on the SAM, this is a

24  work in progress.  I think he used that phrase.

25      What I've seen in reviewing the history of the

1   implementation of the less than 30 SAMs that have been ever put

2   into place is that they are flexible enough to deal with issues

3   like this that arise where defense counsel says:  Hey, this

4   provision says X   We need it to say this.

5       And it's not, you know, a rigid policy that we say:  No,

6   we're going to deny access to certain family members.

7   That's--the procedure as it existed in the past and as it exists

8   now allow for changes like that.  And those types of things will

9   be worked out, and over time I'm sure that defense counsel--over

10  time there may be other provisions that they say:  Hey, can we

11  tweak this?  And those are things that we will work on as

12  quickly as possible.

13          THE COURT:  Well, you worked on--Mr. Hamilton was able

14  to work on getting the mother to visit within 24 hours of my

15  saying it.

16      (Discussion off the record.)

17          MR. TOSCAS:  Are we done with that?

18          THE COURT:  Yes.  Grandma's going to get the visit.

19          MR. TOSCAS:  Just have one other thing I wanted to

20  mention.  And defense counsel and those of us on the

21  government's side have spoken about this, but I want to point it

22  out for the Court's--so the Court knows what we've agreed.

23      Number 6 that deals with legal contacts states:

24  Mr. Ujaama's legal telephone and visitation privileges shall not

25  be suspended or eliminated without promptly providing notice to

1  defense counsel and raising the matter with this court.

2  We just wanted to point out on the record that under

3  extraordinary circumstances and in an emergency situation or in

4  a situation that applies to all inmates where legal visitation

5  is shut down temporarily or not allowed on a particular day,

6  those are not times where a person has the privilege anyway.

7  For example, there was one day that due to an emergency

8  situation no legal visitation was allowed at all, and there was

9  a defense attorney at the door wanting to get in and they said

10  across the board:  We don't allow it.  That is not the type of

11  suspension of legal visits that is contemplated by that

12  paragraph.

13  And defense counsel said they understand that, but I wanted

14  to make sure it was clear and on the record for BOP's purposes.

15  THE COURT:  We hear about those occasionally.  If

16  anything like that happens, whoever the defense counsel is, you

17  don't have to let the Court know about it.

18  All right.  I think we've taken care of it.  So I'll get

19  this sometime tomorrow, and I can sign this.  And you don't have

20  a problem with next Friday, as long as the visitation is going

21  to take place with the grandmother?  There's nothing in there

22  that's going to--you need--I mean, we've got a workable thing

23  going.

24  MR. MAHLER:  Right.

25  THE COURT:  You can all go work on something else now?

1    MR. MAHLER:  I hope so.  When you see the final, Your

2  Honor, I'll just let you know that because of paragraph 1 that

3  has an affirmation--has affirmation language in it, the final

4  copy will have a signature page for the members of the defense

5  team to sign that we've received it and we all agree to be bound

6  by the Court's order.

7    THE COURT:  Good.  Okay.  Anything else?  I shouldn't

8  ask.  I know I shouldn't ask.

9    Okay, guys.  So what's the next problem going to be?

10  Discovery?  Do we still need--

11    MR. OFFENBECHER:  Access to those witnesses in

12  Guantanamo Bay.

13    THE COURT:  Do we all get to go?

14    MR. MAHLER:  Want to go?

15    THE COURT:  No.  I want to go to Cuba.  Supposed to be

16  beautiful.

17    Wait.  Do we still need a status conference?

18    MR. MAHLER:  I think we do.  There are a number of

19  issues that we still have to resolve, and--

20    THE COURT:  Mr. Toscas, you ought to get a room out

21  here, an apartment or something.  Do you stay in a hotel when

22  you come out?

23    We can go off the record.

24    (Discussion off the record.)

25    MR. MAHLER:  I expect it to be short, but I think there

1    are two or three things, carryovers--

2           THE COURT:  You want to talk about them now?

3           MR. MAHLER:  If I can do them from memory.

4           THE COURT:  Well, don't--

5           MR. MAHLER:  Actually--

6           MR. OFFENBECHER:  We could sit down and pencil a few

7    things out.  Or do you want to go ahead?

8           THE COURT:  Can you all do this now?

9      Are you still trying to catch a plane?

10          MR. TOSCAS:  No, Your Honor.  There's no planes after a

11   certain hour until the red-eye, which I intend to take.  So I'm

12   good.

13          THE COURT:  And let me tell you.  I took one of those

14   about a week ago, and they promised me that:  Oh, the bonus of a

15   red-eye is there's nobody else on it.  You can stretch out and

16   go to sleep.

17     That is not the case.

18          MR. TOSCAS:  Used to be the case, but no longer.  The

19   last three times I left Seattle I took red-eyes.  And

20   unfortunately, mine are connections.  So it makes it very

21   difficult.

22          THE COURT:  Aren't you going to D.C.?

23          MR. TOSCAS:  Yes, I am.  But going into National

24   Airport in the times I needed to leave.  And due to the space

25   available, there just was no space available on the nonstops.

1    MR. MAHLER:  Well, Peter was whispering in my ear--and

2  I agree with him--we should probably do this when we're a bit

3  more organized.

4    THE COURT:  Okay.  And you must have an agenda too,

5  Mr. Hamilton.

6    MR. HAMILTON:  We'll handle it without George.

7    THE COURT:  So you want to get together Monday or

8  Tuesday of next week?

9    MR. MAHLER:  We had tentatively set Monday at 10:00.

10 But I don't know if Ms. Tyree--

11   THE COURT:  Oh, you better check with her.

12   MR. TOSCAS:  Monday at 11:00.  I had asked if I could

13 appear by phone, if necessary.

14   THE COURT:  Good.  Okay.

15   (The proceedings concluded at 3:30 p.m.)

16

17

18
                    CERTIFICATE
19    I, Caroline R. Castle, court reporter for the United States
   District Court in the Western District of Washington at Seattle,
20 was present in court during the foregoing matter and reported
   said proceedings stenographically.
21    I further certify that thereafter, I, Caroline R. Castle,
   have caused said stenographic notes to be transcribed via
22 computer, and that the foregoing pages are a true and accurate
   transcription to the best of my ability.
23    Dated this 16th day of December,

24                    _Caroline R. Castle_

                       Caroline R. Castle
25